

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00306-CV

———————————————

IN THE INTEREST OF M.B.-O., B.B.-O., D.B.-O., AND J.B.-O., CHILDREN

---

On Appeal from the 324th District Court
Tarrant County, Texas
Trial Court No. 324-743747-23

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

In this ultra-accelerated appeal,[1] Appellants Mother and Father appeal from the judgment of the trial court terminating their parental rights as to their four children, M.B.-O., B.B.-O., D.B.-O., and J.B.-O.[2] The trial court found by clear and convincing evidence that the Department of Family and Protective Services had proved four conduct-based grounds for termination of the parent–child relationships between each of the four children and both Mother and Father and that termination of each relationship was in the best interest of the children. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (b)(2).

In her appellate brief, Mother raised three points. Because Mother did not meet her burden as to any point, we will affirm the trial court's order as to Mother.

Father's counsel has filed an *Anders* brief indicating that Father has no meritorious grounds for appeal. *See Anders v. California*, 386 U.S. 738, 744, 87 S. Ct. 1396, 1400 (1967). Because our independent review of the record compels us to agree with Father's counsel, we will affirm the trial court's order as to Father.

---

[1]*See* Tex. R. Jud. Admin. 6.2(a)*, reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. F app. (requiring appellate court to dispose of appeal from judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[2]We use initials to refer to minors and relationships to the minors or fictitious names for others as necessary to protect the minors' identities. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

## I. BACKGROUND

### A. History Before the Current Removal

The Department of Family and Protective Services filed three previous cases involving Mother and Father, going back to 2020.[3] In the 2020 case, DFPS received reports that Mother and Father were abusing methamphetamines and cocaine and selling drugs around their children. The case was closed as "unable to determine" for neglectful supervision after Mother and Father refused to consent to drug testing.

Later that year, DFPS received a report that Father threatened to cut Mother with a butcher's knife, an allegation Father denied. The case was eventually closed as "ruled out."

In 2021, Father was convicted of possession of a controlled substance and placed on 24 months' probation. In 2022, Mother was charged with the state jail felony offense of driving while intoxicated with a child younger than 15 years old in the vehicle and with abandonment and endangerment of a child. Mother pled guilty to the felony DWI offense and was sentenced to 20 days' confinement in Tarrant County jail.

In 2022, DFPS received a report that Mother left the children alone and unsupervised for long periods of time. That case was also closed as "ruled out."

---

[3]M.O.-O., B.B.-O., and D.B.-O. were born in 2016, 2017, and 2020, respectively.

In the summer of 2023, Mother, Father, and their three children were living in their car or in hotels while on a waiting list for housing. By November 2023, they had moved into an apartment.

## B. Current Removal

In November 2023, J.B.-O., the youngest of Mother's and Father's children, was born. Based on a report from the medical providers that J.B.-O. had tested positive for cocaine at birth, Ashley Mason, an investigator for DFPS, initiated an investigation. During the subsequent investigation, Mason visited Mother and Father at their home and found it to be appropriate and clean.

Mother and Father agreed to a safety plan in which a family friend would supervise contact with the children in their home. Although the family friend initially agreed to participate in the safety plan, she withdrew from consideration because she refused to complete a drug test and background check. Mother and Father completed drug tests that both returned positive results for cocaine.

After working with Mother and Father for approximately ten days without successfully creating a safety plan, Mason began the process of removal of J.B.-O. and the three older children from the home. Mason did not initially inform Mother or Father that she had begun the process of seeking removal because Mason knew Mother and Father to have a history of not participating with DFPS and feared they would flee with the children. Mason and her supervisor informed Mother by telephone that the petition had been filed. Mason would later testify that Mother responded by saying that "just

because she tested positive for cocaine, it doesn't mean she's a drug user. [Mother] then advised she was a drug dealer."

When the children were removed from Mother's and Father's home, DFPS found them to be clean and that they were not injured. Two of the older children, B.B.-O. and M.B.-O., were developmentally delayed but received tutoring and educational services to assist them with their academics while in foster placement. After being removed from the home, M.B.-O. showed difficulty sleeping, and a hair-follicle test showed a positive result for cocaine. DFPS reported that the children did not otherwise have behavioral issues while in foster care.

Both Mother and Father filed affidavits of indigence and requests for appointed counsel, and the trial court entered orders appointing trial counsel for each in January 2024. Father's counsel filed a motion to withdraw in February 2024, citing inability to communicate with Father in a manner consistent with good attorney-client relations, which the trial court granted in March 2024 and appointed substitute counsel.

### C. Safety Plans and Further Interactions with DFPS

Mother and Father agreed to safety plans proposed by DFPS that were subsequently incorporated into a court order. As part of both of their safety plans, Mother and Father submitted to drug testing. Although both parents had denied drug use, both Mother and Father tested positive for cocaine in January, May, and August of

2024. Mother also tested positive for cocaine in January 2025[4] and for both cocaine and marijuana in April 2025.

Mother was required to complete parenting classes, a psychological assessment, a mental health assessment, a drug and alcohol assessment, and to complete individual counseling, anger management, and a victim intervention and prevention program (VIPP) for victims of domestic violence. Father was required to complete substantially the same services but to complete a batterer's intervention and prevention program (BIPP) in place of the VIPP. Briana Spears, permanency specialist with Our Communities Our Kids, provided Mother and Father with copies of the plans which they signed and agreed to work on.

Mother completed parenting classes, two drug and alcohol assessments, a psychological assessment, an MHMR assessment, and individual counseling. Mother was re-referred to the drug and alcohol assessment because she tested positive for controlled substances after completing the program. Mother was also re-referred for her MHMR assessment because, according to Spears' testimony at trial, "she was not open and honest about information that was asked of her during the assessment." Mother was re-referred for her psychological evaluation because the doctor declined to treat her after she became irate while waiting in the waiting room. When Spears

---

[4]Testimony at the trial indicated that the result demonstrated that Mother had used cocaine within 72 hours of the test. This was a re-test ordered after Mother's and Father's tests returned "negative-dilute" results in December 2024.

6

recommended that Mother complete an anger management class to address issues Mother had with her service providers, Mother became upset, yelled at Spears, and ended the telephone call abruptly.

During the removal, Mother provided electronic tablets for her children to use while they were in foster care. While on a call among Spears, Mother, and the person providing foster care for the three older children, Mother asked Spears whether the tablets had been provided to the children. Spears informed Mother that they had not yet, as the Department needed to determine whether there was tracking software on the tablets before providing them to the children. Mother told Spears that there was tracking software on the tablets, that Mother knew where the children were, and that Mother could follow the children home. The foster care provider disconnected the call and put in a 30-day discharge for the children, seeking to end the foster placement. Spears ultimately convinced the provider to continue the placement.

In February 2025, Father began his required BIPP with Waltina Chavis, a licensed chemical dependency counselor, certified alcohol and drug counselor, and BIPP coordinator. Father attended five of the eighteen sessions required for the program. Father denied having a history of drug use on his counseling intake form. During the counseling sessions, Father spoke to Chavis about Mother's drug use habits,

including her alleged cocaine use in the family home, and said that Mother provided sexual favors for access to cocaine.[5]

After Spears informed Father about a positive drug test result and about an injury[6] to M.B.-O., Mother left a voicemail for Spears. In the voicemail recording that was introduced at trial, Mother said,

> Hey, Brianna, this is [Mother]. I think you need to come talk to me and have the conversation that you had with [Father] or whatever you said. Like, why you're not answering the phone, because this is far from over. Okay? And if I lose my kids, I promise you in Jesus' name, you're gonna lose yours, and I mark that to you.  You have a blessed day.

Conversely, Spears noted that Mother's and Father's interactions with the children, as opposed to service providers and DFPS personnel, were appropriate.

### D.  Alleged Aggravated Assault Incident

Spears's testimony was broken up between the two dates of the trial, beginning on April 17, 2025, and continued to June 27, 2025.

On the evening after the April trial date, Father was arrested for aggravated assault with a deadly weapon against Mother. Spears testified on the second day of the

---

[5]At trial, Father testified that, although he may have asked his permanency specialist about Mother prostituting herself, he was "actually just asking for some opinions." He testified that when he asked, he was assuming things but was not sure what was going on.

[6]While in foster care, M.B.-O. suffered a fractured shoulder when she fell off a "hoverboard" scooter that belonged to one of the older children in the home. In another incident, she fractured a bone in her foot.

trial that Father had spoken to her about his arrest. She testified that he had told her he had an altercation with a man who was staying in the family home and paying rent to the family. When the person did not pay, Father wanted to evict him. The man charged at Father, Father pushed him away, the man went to swing at Father, Father moved out of the way, and Mother was hit. Mother was treated at a hospital.

Father also testified about his arrest. Father testified that he had not been charged with anything and, asked if he were charged with aggravated assault with a deadly weapon, testified that "[t]hat's what they say." After a brief recess, Father amended his testimony, agreeing that he was charged with the offense, but "didn't know that until today." He testified that Mother was the alleged victim of the offense.

Father asserted his Fifth Amendment right against self-incrimination when asked why he was currently incarcerated at the time of the trial.[7] He also asserted the right when asked whether he placed a knife against Mother's throat, pushed her down, threatened another person with a knife, and had been drinking heavily at the time.

Mother was also asked about the incident during her testimony. Mother first stated that she did not recall any interaction with police on that day, then denied having had any contact with the police. She denied having been assaulted that day by Father but admitted going to the hospital for an injury. Mother exercised her Fifth Amendment

---

[7]In a civil case, a factfinder may draw negative inferences against a party from that party's invocation of the Fifth Amendment privilege against self-incrimination. Tex. R. Evid. 513(c); *Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex. 2007).

9

right as to statements attributed to her in a police report, including statements that she and Father had not been getting along; that she believed Father was feeding information to DFPS to cause her to lose custody of her children; that Father had been upset with her for talking behind his back; that Father accused her of having sexual relations with another person; that Father assaulted her with a knife by pressing it against her neck; and that Father knocked her to the ground, placing her in fear for her safety. She identified photographs of her injuries that were taken in the hospital that night but asserted her fifth amendment right when asked about the cause of the injuries.

### E. Mother's Trial Counsel's Motion to Withdraw

Mother's trial counsel filed a motion to withdraw on May 14, 2025, between the two days of the trial, based on a telephone conference with Mother. The trial court took up the motion before resuming testimony on the second day of the trial. Because Mother was not yet present in the courtroom when the trial started, the trial court did not rule on the motion and instead allowed testimony to continue until Mother arrived, but the court indicated an opinion that the motion was a delay tactic. Mother arrived during Spears's testimony. After Spears's testimony was complete, DFPS called Mother to testify, but the court first took up the motion.

When the trial court took up the motion, Mother stated that her trial counsel had just informed her that if counsel withdrew, Mother would have no attorney representing her, so, because she felt she had no choice, she "would have to work with her." The trial court did not contradict Mother's characterization of her options. Trial counsel

10

stated that she was also willing to work with Mother and was prepared to continue. After confirming that counsel was willing to continue her representation, the court resumed the trial without ruling on the motion.

## F. Mother's Testimony

Mother testified that her children were removed from the home because "there was something found in my placenta" at the time of J.B.-O.'s birth, because she did not know she was pregnant until the fifth or sixth month of the pregnancy. During her testimony, Mother stated that she would never willingly expose her children to drugs and that she was not using drugs. She testified that any exposure was not "willing" because she did not know she was pregnant for the first six months of the pregnancy. She rather characterized her actions as casually socializing or self-medicating but clarified that she only used legal substances, "that are available at the store. You know, the ones that the government provides, you know, for the whole world." When asked about her multiple positive drug tests, she clarified that she never said she had never used any illegal substance, but that she would never "willingly, with my children involved, have [done] anything to harm or hurt them relating to anything that was going on with [her]." She clarified that she had used ecstasy, marijuana, alcohol, tobacco, and "some cocaine from outside." Mother testified that she could not remember when she last used ecstasy, although it was likely in the previous six months, and that, referring to ecstasy, "that pill covers cocaine," indicating that the ecstasy she took had cocaine in

11

it as well. Mother said she did not recall telling her case worker that she was a drug dealer but not a drug user.

## G. Order

After presentation of evidence and argument, the trial court terminated Father's and Mother's parent-child relationships with each of the four children, M.B.-O., B.B.-O., D.B.-O., and J.B.-O. The court found clear and convincing evidence of four conduct-based grounds for termination and that the termination was in the children's best interest.

## H. Motion for New Trial and Hearing

After the trial, Mother filed a motion to substitute counsel, which was granted, and a motion for new trial citing grounds of ineffective assistance by her trial counsel, insufficient evidence, and denial of her right to a trial by jury. The trial court took up the motion for new trial at a hearing on August 22, 2025.

At that hearing, only Mother testified, and no exhibits were offered. Mother testified that she had a falling-out with her trial attorney "at some point," and had asked her several times to file a motion to withdraw. Mother testified that her trial attorney advised her that if the motion to withdraw were granted, Mother would have to represent herself. Although Mother asked that the motion be filed, she ultimately continued with her trial attorney because of this advice. Mother testified that her trial counsel failed to call several witnesses, and gave descriptions but no names of any individual witness who was not called during the trial. Mother did not provide a copy

12

of the list of names she said her trial counsel had disregarded. Mother also testified that she had letters from two parenting groups and certificates of completion which were not offered at trial. Mother testified that she did not meet with her trial counsel at her office but had met online and at the courthouse.

Mother's former trial counsel was present at the hearing—and briefly cross-examined Mother—but was not called as a witness and did not testify.

## II. MOTHER'S APPELLATE BRIEF

On appeal, Mother raises three points. In her first point, Mother argues that her trial counsel's advice about her right to substitute counsel constituted ineffective assistance. In her second point, Mother argues that her counsel's representation before and during trial also constituted ineffective assistance. In her third point, Mother argues that insufficient evidence supported the trial court's finding that termination was in the children's best interest.

### A. Ineffective Assistance of Counsel

Mother alleges that her trial counsel's representation fell below professional standards and deprived her of her due process right to counsel.

### 1. Applicable Law

Ineffective-assistance-of-counsel claims in parental-termination cases, as in criminal cases, are governed by the United States Supreme Court's two-prong test articulated in *Strickland v. Washington. In re M.S.*, 115 S.W.3d 534, 544–45 (Tex. 2003)

13

(citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2062 (1984)). The test requires the following:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. A party claiming ineffective assistance of counsel must satisfy both prongs of the *Strickland* test to succeed. *M.S.*, 115 S.W.3d at 545.

In examining counsel's performance under the first prong, "we must take into account all of the circumstances surrounding the case, and must primarily focus on whether counsel performed in a 'reasonably effective' manner." *Id.* (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2065). Counsel's performance falls below acceptable levels only when the "representation is so grossly deficient as to render proceedings fundamentally unfair." *Id.* (quoting *Brewer v. State*, 649 S.W.2d 628, 630 (Tex. Crim. App. 1983)). We give great deference to counsel's choices and indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions are strategic. *In re D.T.*, 625 S.W.3d 62, 74 (Tex. 2021). The challenged conduct will constitute ineffective assistance only when the conduct is so outrageous that no competent attorney would have engaged in it. *Id.*

14

An appellate court may not infer ineffective assistance simply from an unclear record or a record that does not show why counsel failed to do something. *Id.* at 75 (holding that nothing in the record rebutted the presumption of competence); *In re J.P.-L.*, 592 S.W.3d 559, 576 (Tex. App.—Fort Worth 2019, pet. denied) ("We may not speculate in order to find trial counsel ineffective when the record is silent regarding counsel's reasons for her actions"); *see Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) (holding similarly in criminal cases).

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *M.S.*, 115 S.W.3d at 549–50. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *M.S.*, 115 S.W.3d at 550. We must ultimately focus on examining the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069.

### 2. Trial Counsel's Representations of Mother's Right to Counsel

Mother argues in her first point that her due process rights were violated by her trial counsel's advice regarding her right to representation. An argument that counsel's misrepresentation of the law constituted a due process violation is an argument that

counsel was ineffective, so we review this point under the applicable ineffective-assistance standard. *See In re J.O.A.*, 283 S.W.3d 336, 341 (Tex. 2009).

We begin with the Family Code's provisions regarding the right to counsel in a termination case. Family Code Section 107.013 provides that in a suit filed by a governmental entity in which termination of the parent–child relationship is requested, the trial court shall appoint an attorney ad litem to represent the interests of an indigent parent who responds in opposition to the termination. Tex. Fam. Code Ann. § 107.013(a)(1). A parent's filing of an affidavit of indigency triggers the process for mandatory appointment of an attorney ad litem. *In re V.L.B.*, 445 S.W.3d 802, 805 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (op. on reh'g); *In re K.L.L.H.*, No. 06-09-00067-CV, 2010 WL 87043, at *5 (Tex. App.—Texarkana Jan. 12, 2010, pet. denied) (mem. op.); *see In re B.C.*, 592 S.W.3d 133, 134 (Tex. 2019) ("When a parent claims indigence, an attorney shall be appointed if the trial court determines the parent is indigent[.]").

"[T]he United States Supreme Court places termination of parental rights cases in the same category as criminal cases and analogizes a parent losing parental rights to 'a defendant resisting criminal conviction' because both seek 'to be spared from the State's devastatingly adverse action.'" *In re C.L.S.*, 403 S.W.3d 15, 20 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (quoting *M.L.B. v. S.L.J.*, 519 U.S. 102, 125, 117 S. Ct. 555, 567 (1996)). In that interest, Texas courts have applied criminal standards in parental-rights jurisprudence as it relates to effective assistance of counsel.

16

*See M.S.* 115 S.W.3d at 544–45 (adopting the *Strickland* standard in parental-termination cases).

In the analogous criminal context, the right to an attorney is not absolute and must be balanced with "other important considerations relating to the integrity of the judicial process and the fair and orderly administration of justice." *In re J.S.*, No. 02-24-00564-CV, 2025 WL 1478394, at *11 (Tex. App.—Fort Worth May 22, 2025, no pet.)(mem. op.) (citing *Gonzalez v. State*, 117 S.W.3d 831, 837 (Tex. Crim. App. 2003)); *see also United States v. Gonzalez-Lopez*, 548 U.S. 140, 152, 126 S. Ct. 2557, 2565–66 (2006) (noting that trial courts have "wide latitude in balancing the right to counsel of choice against the needs of fairness . . . and against demands of its calendar"); *In re B.C.*, No. 02-22-00256-CV, 2022 WL 17172338, at *6 (Tex. App.—Fort Worth Nov. 23, 2022, pet. denied)(mem. op.) ("[T]he right to counsel may not be used to obstruct the judicial process or to interfere with the efficient, prompt administration of justice."). "Trial courts have the duty, and discretion, to maintain the orderly flow and administration of judicial proceedings, including the exercise of a defendant's right to counsel." *J.S.*, 2025 WL 1478394, at *11 (quoting *Medley v. State*, 47 S.W.3d 17, 23 (Tex. App.—Amarillo 2000, pet. ref'd) (op. on reh'g)).

"A defendant may not use his right to counsel to manipulate the court or to delay his trial." *Id.* (quoting *Culverhouse v. State*, 755 S.W.2d 856, 861 (Tex. Crim. App. 1988)). Similarly, a defendant "does not have the right to repeatedly alternate his position on the right to counsel and thereby delay trial." *Id.* (quoting *Medley*, 47 S.W.3d at 23). "Thus,

an accused may not wait until the day of trial to demand different counsel or to request that counsel be dismissed so that he may retain other counsel." *Id.* (quoting *Webb v. State*, 533 S.W.2d 780, 784 (Tex. Crim. App. 1976)). "Indeed, a trial court's refusal to appoint counsel at the eleventh hour does not render the defendant's invocation of the right to self-representation involuntary." *Id.* (quoting *Davis v. State*, No. 09-15-00450-CR, 2017 WL 1953277, at *3 (Tex. App.—Beaumont May 10, 2017, no pet.) (mem. op., not designated for publication)).

An attorney appointed to represent the interests of an indigent parent is appointed to serve in that capacity until the attorney is relieved of duties or replaced by another attorney after a finding of good cause is rendered by the court on the record. Tex. Fam. Code Ann. § 107.016(2)(C).[8] If a parent is denied counsel at a critical stage of a proceeding to terminate parental rights, such as a final hearing, a presumption of prejudice may be warranted. *In re J.M.O.*, 459 S.W.3d 90, 94 (Tex. App.—San Antonio 2014, no pet.).

Mother argues that her trial counsel's advice, that if the motion were granted her only option would be self-representation, was so egregious as to constitute ineffective

---

[8]In criminal cases, a court confronted with a mid-trial request for change of appointed counsel has three well-defined options: (1) appoint or allow the accused to retain new counsel; (2) allow the accused to exercise the right to self-representation if the accused unequivocally asserts that right; or (3) compel the accused who does not waive counsel and does not assert the right to self-representation to proceed to trial with counsel already appointed, if the court does not allow new counsel. *Burgess v. State*, 816 S.W.2d 424, 428–29 (Tex. Crim. App. 1991).

assistance. Mother testified that she understood that "if I get rid of her today or she withdraws that I'm not going to have anyone represent me, is what she just told me." Presuming this testimony correctly reflected trial counsel's advice to Mother, we cannot say that this is necessarily an incorrect statement of the law, as the statute prescribes that either relief from duties or replacement by another attorney are appropriate outcomes of a motion to withdraw. Tex. Fam. Code Ann. § 107.016(2)(C). And here, the trial court indicated unwillingness to delay the trial by appointing new counsel and characterized the motion as "a delaying tactic to continue this again." This court has held that in a termination case, a parent's using her right to counsel to manipulate the court or delay trial can constitute a waiver of the right to counsel. *J.S.*, 2025 WL 1478394 at *13. Further, we cannot say that counsel's advice to Mother at the hearing, in the face of the trial court's previous statement disfavoring delay, was not advice about a potential ruling by the court rather than a failure to explain mother's rights.

Mother argues that her incomplete understanding rendered her decision to proceed involuntary and the proceedings unfair. Mother correctly argues that, in the criminal context, gross misadvice may render a plea involuntary. *See Ex Parte Moussazadeh*, 361 S.W.3d 684, 691 (Tex. Crim. App. 2012). But even assuming she received incomplete legal advice, she cites no authority—and we can find none—in which a court has determined that incomplete legal advice about a parent's right to

counsel of choice would constitute representation so grossly deficient to render proceedings unfair. *See M.S.*, 115 S.W.3d at 545.

Further, the record is insufficient to support Mother's contention that the advice she received constituted gross misadvice. It is Mother's burden to overcome the presumption that, under the circumstances, the challenged action might be considered trial strategy. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). Moreover, any allegation of ineffectiveness must be firmly founded on the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *J.P.-L.*, 592 S.W.3d at 576; *see also Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002) (stating that trial counsel should be given opportunity to explain actions before being condemned as unprofessional and incompetent).

From the record, the trial court appeared unwilling to appoint new counsel. Further, although the trial court conducted an evidentiary hearing on Mother's motion for new trial and Mother's trial counsel was present, Mother did not call her trial counsel to testify. The record contains no evidence of Mother's trial counsel's trial strategy or any lack thereof, or any reason for any advice she provided. When, as here, the record fails to show counsel's strategy, if any, or what specifically counsel did or did not tell Mother, we cannot conclude that counsel's performance was deficient. *See Jackson v. State*, 877 S.W.2d 768, 771–72 (Tex. Crim. App. 1994). Because the record does not show deficient performance, these allegations also do not meet the first prong of the *Strickland* test. *See Id.*

Because Mother has not met her burden under *Strickland*, we overrule her first point. *See id.*

### 3. Ineffective Preparation and Presentation at Trial

Mother alleges that various deficiencies of representation amounted to ineffective assistance by her trial counsel.

Mother alleges that her trial counsel violated her rights by refusing Mother's offer of a list of potential witnesses and numerous pictures and exhibits for trial.[9] A claim of ineffective assistance based on trial counsel's failure to call a witness cannot succeed absent a showing that the witness was available to testify and that the witness's testimony would have benefitted the parent's defense. *See Ex parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Crim. App. 2007). Mother made no such showing.

At the hearing on Mother's motion for new trial, Mother was asked which witnesses her trial counsel failed to call. Mother did not offer a list of names of witnesses, but only general descriptions, and although she made a general statement that "these people" would be available to testify, she offered no indication that any particular witness would have been available. Further, Mother did not testify what these witnesses could have shown at the trial that would have benefitted her defense and would not have been duplicative of Spears's and Mother's testimony as to the services

___

[9]Although Mother alleges that her trial counsel offered no exhibits, she offered one exhibit during opening—a summary of requested relief.

Mother completed. Mother's allegation that her trial counsel failed to call unnamed witnesses does not satisfy the first prong of *Strickland*, and her failure to demonstrate lack of fairness in the outcome of the case does not satisfy the second. *Id.*

Mother alleges several other deficiencies. Mother argues that her trial counsel, because she "asked her client only six questions that could be considered touching on best-interest issues," did not address the best interest of the children at all.[10] Mother further alleges that she was entitled to a jury trial and that her counsel failed to inform her of that right.[11] Finally, Mother alleges that her trial counsel failed to invite Mother into her office and used Zoom and the courthouse for meetings; failed to issue any discovery to the State; and failed to allocate sufficient time with Mother in preparing for trial.

Again, Mother did not meet her burden to overcome the presumption that, under the circumstances, the challenged actions might be considered trial strategy. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. The record fails to show counsel's strategy in preparation or presentation of evidence at trial, so we again cannot conclude that counsel's performance was deficient. *See J.P.-L.*, 592 S.W.3d at 576; *Jackson*, 877 S.W.2d

---

[10]Mother's trial counsel cross examined each of the petitioner's other witnesses as well as Father, in addition to her questions to Mother.

[11]Parties to a parental-termination case may demand a jury trial or elect to have a judge decide the case on the merits. Tex. Fam. Code Ann. § 105.002. The Order of Termination states that a jury was waived.

at 771–72; *c.f. Anderson v. State*, 193 S.W.3d 34, 39 (Tex. App.—Houston[1st Dist.] 2006, pet. ref'd) (holding that because appellant did not call his trial counsel during motion for new trial hearing to give reasons for failure to investigate or present mitigating evidence, record does not support ineffective assistance claim).

Mother also alleges that she did not understand the implications of her Fifth Amendment right not to testify and that her counsel's failure to interrupt her testimony to explain the right to her was evidence that her counsel did not sufficiently explain the right to her. However, the court explained the right to Mother, and Mother stated that she understood it.[12] Further, although Mother's trial counsel did not interrupt her testimony to explain her Fifth Amendment right to her, the record is silent as to any strategic considerations her trial counsel may have weighed. Because we cannot say that failure to interrupt testimony to explain a client's Fifth Amendment rights is so gross a deviation from professional standards as to render the proceeding unfair, and the record is silent as to Mother's trial counsel's reasons or considerations for any advice given or not given, this argument also fails to satisfy the first prong of *Strickland. M.S.*, 115 S.W.3d at 545.

---

[12]This was after an exchange in which Mother not only asserted and explained the right, but then successfully argued its applicability against DFPS's attorney.

23

Because Mother failed to make the required showing under the first prong of *Strickland* as to each portion of her argument,[13] we overrule Mother's second point.

## B. Evidentiary Sufficiency

Mother argues that insufficient evidence supported the trial court's finding that termination of the parent–child relationship between Mother and each of her four children was in the children's best interests.

### 1. Applicable Law

For a trial court to terminate a parent–child relationship, the party seeking termination—in this case DFPS—must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one termination ground listed in Texas Family Code Section 161.001(b)(1)[14] and (b)(2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

---

[13]Because Mother has not met her burden under the first prong of *Strickland*, we need not address the second. *See D.T.*, 625 S.W.3d at 75; *c.f. Mata v. State*, 226 S.W.3d 425, 433 (Tex. Crim. App. 2007).

[14]Mother does not challenge the trial court's statutory conduct-based findings, and we therefore do not address them.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *J.O.A.*, 283 S.W.3d at 346.

In determining factual sufficiency of the evidence supporting termination of the parent–child relationship, we must perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that DFPS proved that termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

If the evidence is factually sufficient, then it is necessarily legally sufficient as well. *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.).

With proof of one or more of the grounds for termination, the trial court may order termination of the parent–child relationship only if the factfinder also finds by clear and convincing evidence that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(2).

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (b)(2). We also consider the evidence of the following nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;
- the child's emotional and physical needs now and in the future;
- the emotional and physical danger to the child now and in the future;
- the parental abilities of the individuals seeking custody;

26

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

## 2. Best Interest Analysis

For efficiency, we will group relevant *Holley* factors to consider evidence applicable to several together, where possible.

With regards to the children's emotional and physical needs now and in the future, and the emotional and physical danger to them now and in the future, the record reflects that Mother's and Father's past criminal and drug use histories are detrimental

to the best interests of the children. *See Holley*, 544 S.W.2d at 371–72. Mother was convicted in 2022 of driving while intoxicated with one of the children in the vehicle. *See B.C. v. Tex. Dep't of Fam. & Protective Servs.*, 446 S.W.3d 869, 875 (Tex. App.—El Paso 2014, no pet.) (holding conviction for driving while intoxicated relevant to determination of *Holley* factors). Mother's youngest child, J.B.-O., tested positive for cocaine at birth, indicating that Mother used cocaine during her pregnancy—a fact supported by Mother's testimony. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) ("A mother's use of drugs during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child"). Father tested positive for controlled substances throughout the pendency of the case. Mother tested positive for cocaine and other controlled substances throughout the pendency of the case, misrepresented her history of controlled substance use during her assessments, and continued to use controlled substances after completing a drug and alcohol program. *See id* 125–26. ("Drug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct as well."); *see also In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (stating that evidence of endangerment is relevant to a best-interest determination). Further, Mother and Father have a history of domestic violence, as DFPS previously investigated reports of violence, and Father was arrested for assaulting Mother in their home on the first day of the trial. *See In re R.R.*, 294 S.W.3d 213, 235 (Tex. App.—Fort Worth 2009, no pet.)

(holding that exposure to domestic violence is relevant when considering child's best interest).

With regard to the children's desires, the children were happy and well-adjusted in their foster placements and were well cared-for by them. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.). However, the children did not testify at trial as to their desires.

With respect to the parental abilities of the individuals seeking custody and the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one, there was testimony at trial that Mother and Father behaved appropriately toward the children during visitation with them. However, Mother became irate and yelled at staff while the children were present when she had concerns for the children's care and had threatened Spears's children.

With respect to the stability of the home or proposed placement, the testimony at trial indicated that Mother and Father maintained their apartment appropriately at the time of the removal in November 2023. However, in June 2023, while they were on the waitlist for the apartment, Mother and Father lived in their car or in hotels with their three older children. Father also raised concerns that Mother brought people into the home to use illegal drugs or left for days at a time for similar purposes.

With respect to Mother's excuse, if any, for the acts or omissions, there was only one introduced during testimony at trial. Asked about exposing her children to drugs,

Mother testified that she would "never willingly" do so, because she did not know she was pregnant for six months of the pregnancy. She testified that she was not "using," but only "self-medicating" with "just the legal substance[s] that are available at the store . . . that the government provides." She clarified that the substances she used included ecstasy, marijuana, alcohol, tobacco, and cocaine.

Mother argues that, because undisputed evidence of just one factor may suffice to support a finding that termination is in a child's best interest, we must consider her alleged undisputed evidence that Mother had been successfully raising her children for eight years before DFPS "entered her life" as evidence that termination was not in the children's best interest.[15] While we agree that we must consider parental history in reviewing a best-interest determination, Mother's representations of the past history are incomplete.

The first contact reflected in the record between Mother and DFPS was not the 2023 removal, but the 2020 case involving allegations of methamphetamine abuse by Mother and Father.[16] Mother argues that there is no evidence that the children had ever

---

[15]Mother also argues that she was prevented from developing her parental history at trial by ineffective assistance of trial counsel. However, Mother makes no showing that her counsel's representation fell below professional standards, that her counsel's choice was not strategic, or that any failure to further develop Mother's parental history prejudiced her case. *See D.T.*, 625 S.W.3d at 74; *Menefield*, 363 S.W.3d at 593.

[16]There was also testimony introduced without objection that Mother had other, older children but did not have—and had never had—custody of them. However, no details of any DFPS involvement as to those older children is reflected in the record.

suffered abuse or neglect prior to this case. However, two of the children tested positive for cocaine during the course of this case. Testimony indicated that Mother had engaged in illegal drug use in the home and that she traded sexual favors for access to illegal drugs.

Considering her parenting history as a factor with the other best-interest factors, and weighing the entire record, we hold that factually-sufficient evidence supported the trial court's determination that termination was in the children's best interest. *See A.B.*, 437 S.W.3d at 500. Because the evidence was factually sufficient, it was also legally sufficient. *A.S.*, 2016 WL 3364838, at *7.

We overrule Mother's third point.

### III. FATHER'S ANDERS BRIEF

Father's appointed appellate counsel filed a motion to withdraw with his *Anders* brief. *See Anders*, 386 U.S. at 744, 87 S. Ct. at 1400; *see also In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, order) (holding *Anders* procedures apply to parental termination appeals), *disp. on merits*, 2003 WL 2006583, at *1–3 (Tex. App.—Fort Worth May 1, 2003, no pet.) (per curiam) (mem. op.). Father's counsel's brief presents a professional evaluation of the record, an analysis of potential appellate issues, and a demonstration of why there are no meritorious grounds for reversal.

Counsel served the brief on Father and informed him of his right to request the record and to file a pro se response to the *Anders* brief. *See Anders*, 386 U.S. at 744, 87 S. Ct. at 1400; *In re G.C.*, No. 02-20-00368-CV, 2021 WL 1823341, at *1 (Tex.

App.—Fort Worth May 7, 2021, pet. denied) (mem. op.). Counsel also provided Father with a motion for pro se access to the appellate record and this court's mailing address. *See Kelly v. State*, 436 S.W.3d 313, 319–20 (Tex. Crim. App. 2014). Father's counsel informed Father of his pro se right to seek discretionary review of our judgment. *See Kelly*, 436 S.W.3d at 319.

Father has not sought to access the appellate record and did not file a response. The State has declined to file a responsive brief.

Having independently examined the appellate record to determine if any arguable grounds for appeal exist, we conclude that Father's appeal is frivolous. *In re K.W.*, No. 02-23-00082-CV, 2023 WL 4289613, at *1 (Tex. App.—Fort Worth June 30, 2023, no pet.) (mem. op.); *see In re K.A.*, No. 02-23-00014-CV, 2023 WL 3251013, at *1 (Tex. App.—Fort Worth May 4, 2023, pet. ref'd) (mem. op.).

## IV. CONCLUSION

Having overruled each of Mother's points, we affirm the trial court's order as to Mother.

We agree with Father's counsel that Father's appeal is frivolous; thus, we affirm the trial court's termination order as to Father. We deny Father's counsel's motion to withdraw; counsel remains appointed in this case through any proceedings in the Texas Supreme Court unless otherwise relieved of those duties for good cause. *See In re P.M.*, 520 S.W.3d 24, 27–28 (Tex. 2016) (order); *In re J.W.*, No. 02-22-00161-CV,

2022 WL 15076379, at *1 (Tex. App.—Fort Worth Oct. 27, 2022, pet. denied) (mem. op. on reh'g).

/s/ Mike Wallach
Mike Wallach
Justice

Delivered:  December 11, 2025